## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

DAN BISHOP,

        Plaintiff,

   v.

AMY L. FUNDERBURK, in her
capacity as Clerk of the Supreme
Court of North Carolina; PAUL
NEWBY, in his capacity as Chief
Justice of North Carolina; ROBIN
HUDSON, SAMUEL L. ERVIN IV,
MICHAEL MORGAN, ANITA EARLS,
PHILIP BERGER, JR., and TAMARA
BARRINGER, in their respective
capacities as Associate Justices of
the Supreme Court of North
Carolina; EUGENE H. SOAR, in his
capacity as Clerk of the North
Carolina Court of Appeals; DONNA
STROUD, in her capacity as Chief
Judge of the North Carolina Court of
Appeals; and CHRIS DILLON,
RICHARD DIETZ, JOHN TYSON,
LUCY INMAN, VALERIE ZACHARY,
HUNTER MURPHY, JOHN
ARROWOOD, ALLEGRA COLLINS,
TOBY HAMPSON, JEFFERY
CARPENTER, APRIL WOOD, FRED
GORE, JEFFERSON GRIFFIN and
DARREN JACKSON, in their
respective capacities as Judges of
the North Carolina Court of Appeals,

        Defendants.

Civil Action No. 3:21-cv-679

VERIFIED COMPLAINT

Plaintiff alleges:

## NATURE OF ACTION

1.     This action seeks to establish a First Amendment right to compel public disclosure of the votes of Justices and Judges of the North Carolina Supreme Court and North Carolina Court of Appeals to suspend the 2022 election.

## JURISDICTION AND VENUE

2.     This action arises under the First Amendment to the United States Constitution and the Civil Rights Act, 42 U.S.C. §§ 1983, et seq.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights), § 1361(a) (mandamus) and 2201 (declaratory relief).

3.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events or omissions giving rise to the claim occurred in this district.

## PARTIES

4.     Plaintiff Dan Bishop is a resident of Mecklenburg County, North Carolina.

5.     Defendant Amy L. Funderburk is a resident of North Carolina and Clerk of the North Carolina Supreme Court.

6.     Defendant Paul Newby is a resident of North Carolina and the Chief Justice of North Carolina.  He is sued solely in respect of administrative acts or inaction.

7.     Defendants Robin Hudson, Samuel L Ervin IV, Michael Morgan, Anita Earls, Philip Berger Jr., and Tamara Barringer are residents of North Carolina and

2

Associate Justices of the North Carolina Supreme Court. They are sued solely in respect of administrative acts or inaction.

8. Defendant Eugene H. Soar is a resident of North Carolina and Clerk of the North Carolina Court of Appeals.

9. Defendant Donna Stroud is a resident of North Carolina and Chief Judge of the North Carolina Court of Appeals. She is sued solely in respect of administrative acts or inaction.

10. Defendants Chris Dillon, Richard Dietz, John Tyson, Lucy Inman, Valerie Zachary, Hunter Murphy, John Arrowood, Allegra Collins, Toby Hampson, Jeffery Carpenter, April Wood, Fred Gore, Jefferson Griffin, and Darren Jackson are residents of North Carolina and judges of the North Carolina Court of Appeals. They are sued solely in respect of administrative acts or inaction.

## FACTUAL ALLEGATIONS

**Anonymous Court Orders Suspend and Delay Primary Elections**

11. Bishop is the incumbent member of the United States House of Representatives representing the Ninth District of North Carolina.

12. Bishop intends to be a candidate for reelection in the 2022 primary.

13. Bishop made substantial preparations to campaign and compete in the primary election as scheduled by state law on March 8, 2022.

14. As the last step in preparing, Bishop obtained certification of his Mecklenburg County voter registration and residency at the local board of elections on the opening day of candidate filing established by state law, December 6, 2021,

3

and, as required by state law for candidates for U.S. House, transmitted a notice of candidacy including such certification and the filing fee of $1740 by mail to the North Carolina State Board of Elections in Raleigh for filing.

15.     After dispatching his notice of candidacy for mailing, Bishop learned from media reports that the North Carolina Court of Appeals had issued an order "to enjoin indefinitely the State Board of Elections from opening of the candidate-filing period for the 2022 primary elections for Congress, the North Carolina Senate, and the North Carolina House of Representatives."

16.     The order was entered by a panel of three North Carolina Court of Appeals judges in Case No. P21-525, captioned *North Carolina League of Conservation Voters, Inc., et al. v. Representative Destin Hall, et al* (hereinafter the "Panel Order"). The Panel Order was signed by Defendant Soar, as clerk, and stated that it was "[b]y order of the Court," but did not disclose which judge or judges of the court caused it to be issued. A true copy of the order as published on the website of the Court of Appeals is attached as Exhibit A.

17.     In response to the Panel Order, the State and County Boards of Elections suspended candidate filing for congressional and state legislative races across the state, including in this judicial district, but opened candidate filing at noon on December 6 in accordance with state statute for all other offices.

18.     In the late afternoon of December 6, media reported that the Court of Appeals entered another order (hereinafter the "En Banc Order") reversing the Panel

4

Order, such that candidate filing for congressional and state legislative races would proceed.

19.      The En Banc Order was issued in the same proceeding, was again signed by Defendant Soar, and without disclosing individual votes of the judges, stated that by "a vote of the majority of judges," the Court had vacated the Panel Order. A true copy of the En Banc Order as published on the website of the Court of Appeals is attached as Exhibit B.

20.      In response to the En Banc Order, the State and County Boards of Elections began accepting candidate filings in all races, including in this judicial district, and continued doing so through Tuesday, December 7 and into Wednesday, December 8.

21.      Bishop's notice of candidacy and filing fee were received by the State Board of Elections on Wednesday, December 8.

22.      December 8 brought news that the North Carolina Supreme Court had issued an order not only suspending candidate filings once again — for all races — but also changing the date of North Carolina's 2022 primary election from March 8 to May 17, 2022.

23.      At that time, hundreds or thousands of candidates had already filed.

24.      That order was entered in North Carolina Supreme Court Case No. 413P21, captioned *Rebecca Harper et al. v. Representative Destin Hall and North Carolina League of Conservation Voters, Inc. et al. v. Representative Destin Hall*, consolidated (hereinafter the "Supreme Court Order"). It provided, in relevant part:

In light of the great public interest in the subject matter of these cases, the importance of the issues to the constitutional jurisprudence of this State, and the need for urgency in reaching a final resolution on the merits at the earliest possible opportunity, the Court grants a preliminary injunction and temporarily stays the candidate-filing period for the 2022 elections for all offices until such time as a final judgment on the merits of plaintiffs' claims, including any appeals, is entered and a remedy, if any is required, has been ordered.

1. Defendants are hereby enjoined from conducting elections for any public offices in the state on Tuesday, March 8, 2022 and, … instead are directed to hold primaries for all offices on Tuesday, May 17, 2022. …

2. Any individual who has already filed to run for public office in 2022 and whose filing has been accepted by the appropriate board of elections, will be deemed to have filed for the same office under the new election schedule for the May 2022 primary unless they provide [sic] timely notice of withdrawal of their [sic] candidacy to the board of elections during the newly-established filing period; and except to the extent that a remedy in this matter, if any, impacts a candidate's eligibility to hold the office for which they have [sic] currently filed. Any individual who has properly withdrawn their [sic] candidacy is free to file for any other office for which they [sic] may be eligible during the reopened filing period.

…

A true copy of the Supreme Court Order as published on the website of the Supreme Court is attached as Exhibit C.

25.    Despite the "great public interest" and "importance" acknowledged by the Supreme Court's words, the Supreme Court Order, like the two orders from the Court of Appeals (all three orders hereinafter referred to collectively as the "Election Suspension Orders"), concealed the identities of the justices who voted to issue it. The order bore a single, manuscript signature that was illegible, appearing over the words "For the Court."

6

26.     Upon issuance of the Supreme Court Order, the State and County Boards of Elections suspended all candidate filing, including in this judicial district. The State Board of Elections has retained Bishop's filing fee and acknowledged filing of his notice of candidacy but omitted other usual actions to acknowledge his candidacy.

**Public Access Refused**

27.     On December 9, 2021, Bishop requested from Defendant Funderburk by phone any court record disclosing the votes of the justices on the Supreme Court Order.  Funderburk advised that the manuscript signature was Justice Barringer's, as junior associate justice, and that Funderburk "does not have" the votes of the justices.  Asked whether she as Clerk has custody of all records of the Court, Funderburk advised that she only has custody of the Clerk's records and that each justice is custodian of his or her own chambers' records.

28.     Bishop then made immediate written demand to Funderburk and Barringer for a court record disclosing the votes of the justices on the Supreme Court Order.  A true copy of the demand is attached as Exhibit D and incorporated herein by reference.

29.     On December 10, 2021, Funderburk responded, reiterating her prior responses.  A true copy of Funderburk's email with attachments is attached as Exhibit E and incorporated herein by reference.

30.     Neither Justice Barringer nor any other person for the Court responded.

31.     On or about December 10, the following notice appeared on the landing page of the e-filing website for the appellate courts (hereinafter the "E-filing Site Notice"):

> Various media reports have claimed to have information regarding the identity of the judges serving on the petitions panel for December 2021. Because the identity of the judges on the panel is confidential, the court cannot comment on these media reports. To ensure the confidentiality of the petitions panel and to avoid potential judge-shopping, please be advised that the panel membership has been changed as of December 10th.

32.     By the reference to "petitions panel" and the fact that the Supreme Court does not act in panels, Bishop infers that this statement refers to the administrative practices of the Court of Appeals and therefore alleges that that court also has refused media and public inquiries for the votes of the judges in support of and opposition to the Panel Order and En Banc Order.

33.     On December 22, 2021, Bishop caused to be hand-delivered and emailed to the clerks and chief judges of both appellate courts a restated demand for timely public access to votes on the several orders alleged, clarifying and expanding the grounds for such demand. This demand is attached as Exhibit F and incorporated herein by reference. Defendants have failed and refused to furnish such access.

**Tradition of Public Access**

34.     For at least 150 years, the North Carolina Supreme Court has continuously disclosed votes of the justices by publishing case reports in the form of signed opinions (including concurrences and dissents). The Court of Appeals has followed the same practice since its establishment in 1967.

8

35.    Pursuant to a Rule of Appellate Procedure promulgated by the Supreme Court, the Court of Appeals renders some of its case decisions by opinions that are not published.  N.C.R. App. P. 30(e).  These opinions nevertheless identify the votes of the judges and are publicly available, including from the Court's website.

36.    Accordingly, there is a well-established tradition of public access to the votes of individual justices and judges in the decisions of these courts.

**Departure from Public Access Without Rational Basis**

37.    On occasional "per curiam" opinions published by the Supreme Court and on other orders issued by both appellate courts to manage appeals or address petitions outside the usual appeal process, such as the Election Suspension Orders, the appellate Courts do not set forth the votes of the justices and judges.  In such cases, the appellate courts refuse public access requests for the votes of the justices and judges on these orders.  This is an unwritten practice that is without rational basis, and certainly not supported by any compelling governmental interest that cannot be readily accommodated by other means that do not prohibit public access.

38.    As the orders alleged above make clear, the distinction between the Election Suspension Orders and opinions that disclose the votes cannot be based on significance to the public interest or the jurisprudence of the State.  The Supreme Court Order acknowledges on its face its enormous public and jurisprudential significance.  That order — and the Panel Order, before being vacated by the En Banc Order — reversed a December 3 trial court order that <u>denied</u> a preliminary injunction to stop the primary election, which is attached as Exhibit G.  Typically, a reversal would come by means of a published opinion disclosing the votes of the justices or

judges. *See, e.g. TSG Finishing, LLC v. Bollinger*, 238 N.C. App. 586, 587, 767 S.E.2d 870, 873 (2014) (Hunter writing for the court, McGee and Bell concurring: "we reverse the trial court's order and remand with instructions to issue the preliminary injunction"); *see also Setzer v. Annas*, 286 N.C. 534, 541, 212 S.E.2d 154, 158 (1975) (Sharp writing for the court, Copeland and Exum not participating, and Huskins dissenting: "The decision of the Court of Appeals is reversed, and the cause is remanded to that court with the direction to vacate the preliminary injunction … and [to further remand to the trial court] for a *de novo* hearing on plaintiffs' motion for preliminary injunction").

39.     Here, without published opinion or any statement of justifying facts or legal reasons, the Supreme Court entered its own, literal "preliminary injunction" stopping the election process even more directly than if it had proceeded via remand and instruction, and with far greater impact upon the public interest than in the typical dispute among private litigants.    The Panel Order likewise — despite responding to a "motion for temporary stay" — ordered directly an immediate injunction of candidate filing for legislative offices, with similar public impact.

40.     Neither the Supreme Court nor the Court of Appeals has promulgated a policy attempting to articulate any compelling, countervailing governmental interest served by selectively denying public access to judges' votes.

41.     The E-Filing Site Notice alleged in paragraph 31 above may be a *post-hoc* attempt by the Court of Appeals to articulate such an interest but is deficient on its face.  It suggests that the identities of judges acting on "petitions" to the court, *i.e.*

Case 3:21-cv-00679   Document 1   Filed 12/22/21   Page 10 of 17

outside the ordinary appeal process, must be kept confidential because the three-judge "petitions panel" sits for monthly stints before reassignment, and that revealing their identities would give rise to a risk of "judge-shopping" by other prospective petitioners.

42. It is implausible and speculative that an occasional media report or request from the public incidentally exposing identities of the judges assigned to the current month's petitions panel would lead to significant judge-shopping. It is likelier that the timing of most petitions to the court is driven by the need for prompt relief. Furthermore, this articulated interest does not justify continuing to conceal the petitions panel judges' identities after their monthly assignments conclude.

43. In the present case, since the E-Filing Site Notice reveals that "the panel membership has been changed as of December 10th," the identities of the judges signing the Panel Order can be safely disclosed. And this rationale never furnished justification for concealing the votes on the En Banc Order.

44. The public, including Plaintiff, has a right of access to the votes of justices and judges on the Election Suspension Orders and on all other orders issued.

**The Orders Are a Matter of Intense Public Interest.**

45. The judges' votes on the contradictory Election Suspension Orders are of surpassing public significance for all the following reasons:

      a)    All North Carolina appellate judges are elected.

      b)    Elections for both appellate courts occur in 2022.

      c)    One of the Associate Justices of the Supreme Court, Samuel J. Ervin IV filed his candidacy for re-election before the Supreme Court Order stopped such

11

filings for others. Two candidates, including a Court of Appeals judge, filed in the opposite party primary for Justice Ervin's current seat and must first compete in a primary to oppose his bid for reelection. Justice Ervin may have provided the deciding vote in favor of the Order. If so, he thereby delayed indefinitely the entry of any competitor from his own political party into the race. He also delayed by two months the primary election of his eventual general-election opponent, thereby reducing the time for head-to-head campaigning against him during general election.

      d)     Three other Court of Appeals Judges have already filed to be candidates for reelection to the Court of Appeals. Any of the six Court of Appeals Judges may have voted for or against the Panel Order and En Banc Order despite being on the ballot themselves.

      e)     The Election Suspension Orders come in litigation over new decadal districting maps enacted by the North Carolina General Assembly. The General Assembly drew those maps using highly restrictive procedures imposed by a state court in 2019 to maximize legislative transparency in a previous remedial map-drawing. The state court dictated that the General Assembly must "conduct the entire [redistricting] process in full public view. At a minimum, this requires all map drawing to occur at public hearings, with any relevant computer screen visible to legislators and public observers." *Common Cause v. Lewis*, Case No. 18 CVS 014001, 2019 WL 4569584 at *137 (Wake Cnty. Super. Ct. Sept. 3, 2019); *Harper v. Lewis*, Case No. 19 CVS 012667, 2019 N.C. Super. LEXIS 122 at *24 (Wake Cnty. Super. Ct. Oct. 28, 2019). That state trial court later approved the remedial districts drawn for

the 2020 election, observing that "both the Senate and the House conducted the vast majority of the remedial redistricting process in public hearings, broadcast by audio and video live stream, so that Plaintiffs and interested public could view the process in its entirety." *Common Cause v. Lewis*, Case No. 18 CVS 014001, slip op. at 3 (Wake Cnty. Super. Ct. Oct. 28, 2019). Ironically, the General Assembly retained these transparency procedures in enacting this year's new maps, only to see the election process upended again anyway with a series of contradictory orders by state appellate judges who concealed their own identities while doing so.

f)      These orders are the latest in an ever increasing, nationwide flood of state and federal litigation throwing election processes into disarray and confusion. North Carolina voters have endured a decade of serial, unrelenting litigation challenges to districting maps, featuring repeated, court-ordered disruptions and threats of disruption to election schedules. Indeed, the 2019 state-court litigation itself reached a resolution on the eve of the scheduled candidate filing, leaving uncertain until then whether the election would proceed and under what maps. But the North Carolina Supreme Court — in another anonymous order, see Exhibit H — refused to adjudicate those plaintiffs' residual objections to the remedial districting plans during the ensuing two-year interregnum, leaving them to reemerge in new lawsuits to disrupt yet another election.

g)      Across the country, the 2020 elections were infamously marred by "a proliferation of pre-election litigation that creates confusion and turmoil," in the words of Fourth Circuit Judges Wilkinson, Agee and Niemeyer — "385 lawsuits filed

13

against election rules this year," threatening to "make a mockery of the Constitution's explicit delegation … to the state legislatures" of the power to make election rules. *Wise v. Circosta*, 978 F.3d 93, 105, 116 (4th Cir. 2020) (Wilkinson, Agee and Niemeyer, dissenting).

46.     Bishop seeks to obtain the judges' votes on the Election Suspension Orders in order to further publish and use them in the course of robust First Amendment-protected political debate and discourse concerning these subjects.

47.     Any significant delay in access to such documents and information will severely and irreparably impair the usefulness of access and the associated First Amendment-protected interest because of the loss of contemporaneity between the acts of the judges and publication of news thereof.  The First Amendment-protected interest will retain no significant value unless the deprivation of access is remedied almost immediately and in any event well prior to the general election 2022.

## FIRST CLAIM FOR RELIEF: VIOLATION OF FIRST AMENDMENT RIGHT OF ACCESS

48.     The foregoing allegations are incorporated herein by reference as if fully set forth.

49.     The First Amendment affords a right of public access to a judicial proceeding or record that has traditionally been open to the press and general public and where public access plays a significant positive role in the functioning of the particular process in question.  *See Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 326 (4th Cir. 2021).

50. As alleged above, the votes of individual appellate judges in North Carolina have traditionally been published and thereby open to the press and public. In addition, Article I, Section 18 of the North Carolina Constitution guarantees a qualified public right of access to civil actions, *Virmani v. Presbyterian Health Servs. Corp.*, 350 N.C. 449, 475-76, 515 S.E.2d 675, 693 (1999), and North Carolina statutory law provides generally for public access to records in all court proceedings, N.C. Gen. Stat. § 7A-109(a), and is supplemented by a far-reaching general public records statute, *id.* §§132-1, et seq. All of this speaks to broad traditional access.

51. Public access to votes of individual appellate judges plays a positive role in the functioning of the judicial process because openness of that process, including appellate litigation, affords citizens a form of legal education and hopefully promotes confidence in the fair administration of justice. *Courthouse News Serv.*, 2 F.4th at 327. Moreover, access allows the public to participate in and serve as a check upon the judicial process — an essential component of our structural self-government. *Id.* This is especially true in North Carolina given that, except for vacancy appointments, all appellate judges are elected by the people. Complete information about the performance of appellate judges must be available to the people in order to inform the people's vote.

52. Accordingly, a qualified first amendment right of public access attaches to records depicting the appellate judges' votes. *Id.* at 326

53. Bishop has properly and effectively invoked the right of public access and is entitled to exercise it.

54.     There exists no compelling, countervailing governmental interest in protecting the confidentiality of the appellate judges' votes on the Election Suspension Orders sufficient to justify Defendants' actions and inaction resulting in the denial of prompt access by Bishop.  Even if an overriding or compelling interest did exist, there are far less restrictive means of protecting any such interest. Defendants' practices are not narrowly tailored as required by law.

55.     Bishop has no adequate remedy at law to prevent or address Defendants' unconstitutional actions and is suffering and will suffer irreparable harm as a result of Defendants' violations of Bishop's First Amendment rights.  *Roman Catholic Diocese v. Cuomo*, 141 S. Ct. 63, 67 (2020) (""the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."") (quoting *Elrod v. Burns*, 427 U.S. 347, 343 (1976)).

56.     Pursuant to 42 U.S.C. § 1983, Bishop is entitled to declaratory and both preliminary and permanent injunctive relief to remedy and cease the ongoing deprivation of First Amendment rights guaranteed to Bishop.

## DEMAND FOR RELIEF

WHEREFORE, Bishop demands judgment against Defendants in their official capacities for the following relief:

1.     Mandamus or preliminary and permanent injunctions against Defendants, in their official capacities, including their agents, assistance, successors, employees, and all persons acting in concert or cooperation with them, or at their direction or under their control, prohibiting them permanently from continuing their

Case 3:21-cv-00679   Document 1   Filed 12/22/21   Page 16 of 17

policies and practices resulting in denial or delay of access to votes on any matter by a justice or judge of the Supreme Court or Court of Appeals;

2.     Declaratory judgment pursuant to 28 U.S.C. § 2201 declaring Defendants' policies and practices that knowingly deny or delay access to votes by a justice or judge of the Supreme Court or Court of Appeals as unconstitutional under the First Amendment to the United States Constitution, for the reason that Defendants' policies and practices constitute an effective denial of a protected right of public access to court processes and records;

3.     An award of costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

4.     All other relief to which Bishop is entitled.

This 22nd day of December, 2021.

/s/J. Daniel Bishop
J. Daniel Bishop (N.C. State Bar No. 17333)
2216 Whilden Court
Charlotte, North Carolina  28211
Telephone:  (704) 619-7580
E-mail:  dan@votedanbishop.com

Attorney for Plaintiff

## VERIFICATION

I declare under penalty of perjury under the laws of the United States that foregoing is true and correct.

Dan Bishop

17